The ESTATE OF Brett M. MILOS, Decedent, Terry and Stan Milos, Personal Representatives of the Estate of Brett M. Milos, on behalf of said Estate, and Terry and Stan Milos, Appellants,

v.

QUALITY ASPHALT PAVING, INC., Appellee.

No. S–11835.

Supreme Court of Alaska.

Oct. 13, 2006.

As Corrected Dec. 4, 2006.

⚷2084

Phillip Paul Weidner, Lisa J. Rosano, Weidner & Associates, Inc., Anchorage, for Appellants.

Eric P. Gillett, Preg O'Donnell & Gillett, PLLC, Seattle, Washington, and Mark E. Wilkerson, Wilkerson, Hozubin & Burke, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Brett Milos, an employee of Quality Asphalt Paving (Quality), was driving a company ATV on a Quality work site when he contacted a power line and was electrocuted. Milos's estate sued Quality for wrongful death. The superior court granted summary judgment to Quality, holding that AS 23.30.055, the exclusive remedy provision of the Alaska Workers' Compensation Act, barred the estate's claims. Because the evidence permits an inference that Milos was off-shift at the time of the accident, and because this fact is material to whether Milos's death arose out of and in the course of his employment, we reverse the judgment of the superior court and remand.

## II. FACTS AND PROCEEDINGS

Brett Milos worked for Quality Asphalt Paving as a materials technician at a gravel pit near Willow.[1] He was to gather and test samples of the gravel after it was crushed to determine whether it met standards for road construction. His job required a significant amount of waiting. Materials technician Patrick Cummins, a coworker, explained that each test lasted two hours but required only thirty to forty-five minutes of work by the tester. Employees spent the remaining time reading books, doing paperwork, listening to the radio, or otherwise "passing the time."

Quality stored the gravel in large stockpiles throughout the work site. Two of these stockpiles were placed on either side of a live power line running through the site. As these two stockpiles grew, the gravel largely filled in the space beneath the power line. At the time of the accident, the gravel was only six feet below the power line.

The accident occurred around 10:00 P.M. on August 14, 2001. Cummins and Milos were both working that evening. Milos was testing a sample in the test lab while Cummins was in the gravel pit, examining rocks. When Cummins returned, Milos was in his pickup truck listening to the radio, apparently waiting for a stage of the testing to finish. Cummins entered the lab to check Milos's calculations. While Cummins was in the lab, Milos got on a company ATV parked outside the lab and drove to the top of the gravel piled under the power line. When Milos reached the top, his head contacted the power line and he was electrocuted.

Cummins and another employee, crusher operator Mark Crawley, both later testified that there was no reason for Milos to be on the stockpiles at the time of the accident. The superintendent of the operation, Thomas Pitt, testified that Milos was "goofing off instead of doing his job of material testing" at the time of his death.

Drawing all reasonable inferences in favor of the estate, we assume that Milos was not authorized to use the ATV. According to the Alaska Division of Occupational Safety and Health (DOSH) report, the ATV was "primarily used by the road crew to take line and grade measurements" and technicians used a pickup truck to haul samples. Cummins testified that Quality had previously allowed Milos to use the ATV to carry gravel samples back to the lab but that by the time Cummins started working at the site Milos was using a coworker's pickup truck and no longer needed to use the ATV. Milos's supervisor, Larry Schmidt, testified that Milos "had no business on that four-wheeler" because "[h]e had a pickup truck there for his use to take samples." Pitt, the superintendent, testified that he did not know Milos was using the ATV but would have fired him had he known what Milos was doing. Roger Brown, the crusher foreman, testified that he did not know Milos was driving the ATV but would have stopped him had Brown known. Crawley, the crusher operator, also testified that Milos was not authorized to use the four-wheeler.

The parties dispute on appeal whether the evidence permits an inference that Milos was off-shift at the time of his death. Although the deposition testimony of Crawley, coupled with the DOSH accident report, suggests that Milos's shift ended before the accident, both Cummins and Schmidt testified that Milos was still on duty when the accident occurred.

In August 2003 Milos's estate sued Quality and others for negligence, loss of consortium, emotional distress, and punitive damages. Quality moved for summary judgment in March 2004, arguing that workers' compensation was the estate's exclusive remedy. After procedural delays not relevant here, the superior court granted summary judgment to Quality, holding that Milos's injuries arose out of and in the course of his employment even if he was not authorized to use the ATV and was off-shift at the time of the accident. The court therefore concluded that AS 23.30.055, the exclusive remedy provision

---

1. Because we are reviewing the superior court's grant of summary judgment to Quality, we recite the facts in the light most favorable to the estate. See *Kaiser v. Umialik Ins.*, 108 P.3d 876, 879 (Alaska 2005). This statement of facts does not preclude the parties from litigating any genuine factual disputes on remand.

of the Alaska Workers' Compensation Act (AWCA), barred the estate's suit.[2]

The estate appeals.

## III. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate if the record demonstrates that "there is no genuine issue as to any material fact and ... [the] party is entitled to a judgment as a matter of law."[3] All reasonable inferences of fact must be drawn in favor of the losing party and against the prevailing party.[4] We review grants of summary judgment de novo.[5]

### B. The Superior Court Did Not Apply the Statutory Presumption of Compensation to Milos's Accident.

The estate first argues that the superior court erred because it applied to Milos's accident the AWCA presumption that an employee's claim is compensable under workers' compensation. Alaska Statute 23.30.120 provides that "[i]n a proceeding for the enforcement of a claim for compensation under this chapter it is presumed in the absence of substantial evidence to the contrary, that ... the claim comes within this chapter." The superior court mentioned AS 23.30.120 in explaining why the estate's argument that Milos was not covered by workers' compensation if he was off-shift was "oversimplifie[d]."

The estate is correct in contending that the presumption of compensability does not apply to cases in which an employer is using workers' compensation as a defense to a negligence suit.[6] But it is mistaken in believing that the superior court actually applied any sort of evidentiary presumption here. The court mentioned the presumption only once, while explaining that the scope of workers' compensation is broad. The court appeared to be citing the presumption as evidence of the legislature's intent to cast the net of workers' compensation broadly, not as a principle of law directly applicable to this case. There is no indication that the superior court required the estate to produce "substantial evidence" that Milos's injury was not within the scope of workers' compensation. In fact, the court effectively accepted all of the estate's factual contentions but held that they were immaterial to the question of compensability: "The relatedness [between Quality's actions and Milos's accident] is sufficiently strong that it overpowers and dispels all contrary factors: the end of the shift, the lack of employer benefit, the unauthorized use of the four wheel ATV for horseplay."

The estate's briefing on this issue appears to suggest that summary judgment imposes some sort of "burden" on the movant to persuade the court on issues of law as well as issues of fact. The estate argues "[i]t is not the Appellants' burden to prove that the on-shift or off-shift status of an employee precludes a grant of summary judgment." Although it is certainly true that a party can waive a legal argument by giving it only cursory treatment in its brief,[7] the movant need not "prove" its interpretation of the law.

---

2. AS 23.30.055 provides in relevant part that

   [t]he liability of an employer prescribed in [the workers' compensation act] is exclusive and in place of all other liability of the employer and any fellow employee to the employee, the employee's legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from the employer or fellow employee at law or in admiralty on account of the injury or death.

3. Alaska R. Civ. P. 56(c).

4. *Kaiser*, 108 P.3d at 879; *Alpine Indus., Inc. v. Feyk*, 22 P.3d 445, 447 (Alaska 2001).

5. *Kaiser*, 108 P.3d at 879.

6. AS 23.30.120 (limiting scope of presumption to "a proceeding for the enforcement of a claim for compensation under this chapter"); *Himschoot v. Shanley*, 908 P.2d 1035, 1041 (Alaska 1996) (holding that presumption was inapplicable in case in which injured worker sued in tort); *see also Alaska Pulp Corp. v. United Paperworkers Int'l Union*, 791 P.2d 1008, 1011 (Alaska 1990) (characterizing statutory presumption as "pro-worker" and refusing to apply it to "facilitate proof of an employee status contrary to that asserted by the worker").

7. *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991) (holding that point given only cursory statement in argument portion of brief is waived).

It is the court's responsibility to determine the law. Once a party has made a bona fide legal argument on a particular point, the court may properly consider it even if the party's presentation of its argument is unpersuasive or inept. The estate's argument therefore fails.

### C. The Dispute About Milos's "Clock Status" at the Time of the Accident Is Genuine.

■ The estate argues that the question whether Milos was on- or off-shift at the time of the accident is both genuine and material to whether Milos's injuries arose out of and in the course of his employment with Quality. The superior court appears to have thought that the dispute over Milos's "clock status" was genuine but held that the dispute was not material. Quality argues that Milos's clock status is neither genuine nor material. We turn first to the question of genuineness.

■ The standard for finding a genuine issue of fact at summary judgment is lenient. We "will not engage in a weighing of the evidence on summary judgment; there is a 'genuine issue' of material fact as long as the non-movant has presented *some* evidence in support of its legal theory."[8] Thus we have held that a putative father created a genuine issue of fact by contesting a highly accurate paternity test with a sworn statement that he was not the father.[9]

Under this lenient standard, the estate submitted enough evidence to create a genuine issue of fact as to Milos's clock status. Crusher operator Crawley testified in his deposition that he thought Milos's shift on the day of the accident ran from noon to 10:00 P.M. The DOSH report places the time of the accident at between 10:00 and 10:30 P.M. Crawley also testified that he had no reason to dispute an alleged police report[10] stating that troopers responded to the 911 call regarding Milos's accident at 10:08 P.M. A factfinder could reasonably find from this evidence that the accident occurred after Milos's shift ended.

Although Quality points to what it calls the "unequivocal" testimony of Cummins that Milos was on-shift at the time of the accident, the DOSH report and Crawley's testimony, if believed, suggest that Milos's shift ended before the accident occurred. It is for a factfinder to determine which witnesses are most credible.

■ Quality argues that there is no evidence that Crawley had personal knowledge of what time Milos's shift ended on the day of the accident and that Crawley's testimony is therefore inadmissible under Alaska Evidence Rule 602. Rule 602 prohibits witnesses from testifying to a matter unless it is demonstrated that they have personal knowledge of it.

The estate's attorney asked Crawley how he knew the hours of Milos's shift. Crawley responded:

> Well, it's just that we had one technician. He's taking care of two shifts. And when he come in at noon, he took care of the first shift, and then the last—later part of his shift after—when first shift stopped and then night shift started, the second shift, there is a 30–minute dead time of the two shifts corresponding, ganging up, getting the maintenance done on the crusher, oiling or any—you know, taking care of any problems. And then he would take off. Then we would take off.

> Brett [Milos] would be back to take samples. He would run one sample, two samples for me and—he would run one sample. If all the samples were good that day, he would run one sample. If we were having problems where our gradations were jumping around on us and stuff, he would hang in there and run more samples.

Although this passage is a little hard to decipher, it appears to establish that Crawley

**8.** *Alakayak v. British Columbia Packers, Ltd.*, 48 P.3d 432, 449 (Alaska 2002) (emphasis in original).

**9.** *See Meyer v. State, Dep't of Revenue, Child Support Enforcement Div. ex rel. N.G.T.*, 994 P.2d 365, 368 (Alaska 1999).

**10.** The police report itself is not in the appellate record. Police reports are inadmissible in civil cases under Alaska Evidence Rule 803(8)(b).

was basing his statements about Milos's hours on both his knowledge obtained through working with Milos and his understanding that the overall operation required materials testers to work at certain times relative to the crews. It is true that Crawley's statements appear to be informed by general knowledge of Milos's typical working hours rather than by specific knowledge of his hours on the day of the accident. But evidence of Quality's routine practice of assigning shifts is admissible under Alaska Evidence Rule 406 "to prove that the conduct of the ... organization on a particular occasion was in conformity with the ... routine practice." Crawley's explanation therefore provides an adequate foundation for his statement despite testimony of other employees that Milos was working different hours on the day of the accident. If the factfinder were to find Crawley's testimony more credible than that of Quality's witnesses, it could properly find that Milos's shift ended at 10:00 P.M.

### D. The Dispute About Milos's Clock Status at the Time of the Accident Is Material.

The primary issue in this appeal is whether Milos's clock status is material to whether his injuries arose out of and in the course of his employment.

The superior court held that the "unforgivable misconduct" of Quality by placing a stockpile below a power line and the foreseeability of the resulting injury to Milos established that the injury was sufficiently work-related to arise out of Milos's employment with Quality. The court stated that "contrary factors" such as "the end of the shift, the lack of employer benefit, [and] the unauthorized use of the four wheel ATV for horseplay" were "overpower[ed]" by Quality's misconduct. On appeal, the estate ar-

gues that Milos's activities cannot be work-related if they occurred after his shift ended.[11] Although it is not necessary to consider whether, as the estate contends, an employee must be on-shift when injured to be covered by workers' compensation, we do hold that in the circumstances of this case, Milos's off-shift status, if proved, may exclude him from the scope of workers' compensation.

Alaska Statute 23.30.010(a) provides that workers' compensation extends to injuries that "arose out of and in the course of the employment." According to AS 23.30.395(2), the phrase "arising out of and in the course of employment" includes

> employer-required or supplied travel to and from a remote job site; activities performed at the direction or under the control of the employer; and employer-sanctioned activities at employer-provided facilities; but excludes recreational league activities sponsored by the employer, unless participation is required as a condition of employment, and activities of a personal nature away from employer-provided facilities.

Alaska Statute 23.30.010(a) requires payment of benefits "if, in relation to other causes, the employment is the substantial cause of the disability or death or need for medical treatment." We have looked in our cases to whether "the accidental injury or death is connected with any of the incidents of one's employment"[12] and whether the employee's activity is "reasonably contemplated and foreseeable by the employment situation."[13] Another important consideration is whether the activity benefits the employer in some way.[14]

The statutory definition of "arising out of and in the course of employment" provides little guidance here. Quality argues that AS

---

11. We infer, from the estate's exclusive focus on the issue of whether Milos was off-shift at the time of the accident, that it concedes that Milos's lack of authorization to use the ATV, standing alone, is not sufficient to place Milos's accident outside the scope of workers' compensation.

12. *M–K Rivers v. Schleifman*, 599 P.2d 132, 134–35 (Alaska 1979) (*quoting N. Corp. v. Saari*, 409 P.2d 845, 846 (Alaska 1966)).

13. *Id.* at 136; *see also Marsh v. Alaska Workmen's Comp. Bd.*, 584 P.2d 1134, 1136 (Alaska 1978) (holding that activity is covered if "reasonably foreseeable and incidental" to employment).

14. *See Luth v. Rogers & Babler Constr. Co.*, 507 P.2d 761 (Alaska 1973).

23.30.395(2)'s exclusion of "activities of a personal nature away from employer-provided facilities" implies that personal activities on an employer's premises are included, even if they occur off-shift. But Quality's argument fails to recognize that Milos's actions also do not fall within the scope of activities identified by the statute as included in workers' compensation. Resolving all inferences in favor of Milos, his use of the ATV was not an "employer-sanctioned activit[y] at employer-provided facilities"[15] because he was not authorized by Quality to use the ATV. It is also difficult to see how Milos might be considered to have been acting "under the control of" Quality at the time of the accident if it is true that Milos was both off-shift and committing a fireable offense.[16] Hence, the most relevant examples of covered activities in the statute seem to exclude Milos's actions. Because the statutory definition neither clearly includes nor clearly excludes Milos's actions, we turn to our case law.

Quality argues that *Seville v. Holland America Line Westours*[17] requires us to affirm the superior court. In that case, an employee leaving work slipped on an icy sidewalk that the employer was legally obligated to maintain.[18] We held that workers' compensation was applicable, reasoning that

> when an employer, in connection with the operation of its business, is charged with a legal duty to control or abate a specific hazard in the area adjacent to its premises—even a common hazard to which the general public is exposed—the legal duty itself supplies the necessary element of work-relatedness.[19]

Quality argues that if failure to abate a danger off-premises can create the necessary element of work-relatedness, then a failure to abate a danger on-premises must also create work-relatedness.

The superior court agreed, noting that "[t]his judge has great difficulty understanding why a tumble by an off-shift worker, off-premises, due to a hazard (icy sidewalk) not abated by the employer, should be compensable; but a post-shift on-site accident from a hazard affirmatively created by the employer should not be compensable."

*Seville* is distinguishable from this case. *Seville* created an exception to the "premises rule." The premises rule states that employees are covered by workers' compensation while coming and going from work for only as long as they are on the employer's premises.[20] The exception to this rule recognized in *Seville*, known as the "special hazards exception," holds that an injury occurring due to "special hazards" on the normal route that employees must traverse to reach the employer's premises is covered by workers' compensation.[21] But neither the premises rule nor any of its exceptions is directly relevant here because Milos was not going to or coming from work at the time of the accident.

Quality's argument—that *Seville's* holding that an off-premises accident was compensable requires us to hold that Milos's on-premises accident is also compensable—ignores a crucial part of our holding in that case. We reasoned there that the special hazard exception is justified because if employees are forced to traverse a particular route to reach their worksite, "the special hazards of that

---

**15.** AS 23.30.395(2).

**16.** *See id.* Quality argues that Milos's activities were under the control of the employer because Quality "controlled" the ATV, the employees, and the existence of the stockpiles. Quality reads the "direction or control" requirement of AS 23.30.395(2) too broadly. It is apparent from the plain text of the statute that it is not the personnel or instrumentalities of the activity that must be "directed" or "controlled" by the employer, but the activity itself. Thus, to fall into this category, the activity must, at a minimum, be authorized by the employer. Quality does not dispute that there is a genuine factual dispute about whether it authorized Milos's use of the ATV.

**17.** *Seville v. Holland Am. Line Westours*, 977 P.2d 103 (Alaska 1999).

**18.** *Id.* at 105.

**19.** *Id.* at 109.

**20.** *Id.* at 106; *see also* 1 ARTHUR LARSON & LEX LARSON, LARSON'S WORKERS' COMPENSATION LAW § 13.01 (2005).

**21.** *Seville*, 977 P.2d at 108.

route become the hazards of the employment."[22] Leaving work for the day via an employer-maintained sidewalk is a hazard "reasonably contemplated and foreseeable by the employment situation."[23] We are not convinced that Milos's unauthorized, post-shift activities were similarly "reasonably contemplated by" or "incidental to" Milos's employment, even if they might have been foreseeable.[24] Traveling to and from work is an unavoidable part of employment. Employees "necessarily rely upon" the employer to keep the paths into the workplace free from hazards.[25] In contrast, drawing all inferences in the estate's favor, Milos's actions were voluntary, unauthorized, and on his own time. He could not have "necessarily" relied upon Quality to protect him from the exposed power line because there was no employment-related reason for him to drive the ATV up the stockpile. In short, the hazards posed by the ATV and power line in the particular circumstances of this case were not necessarily "the hazards of the employment."[26]

Quality also points to *Witmer v. Kellen* to support its argument that workers' compensation is broad enough to cover Milos's actions.[27] But *Witmer* is also distinguishable from this case. Witmer, the president and sole shareholder of a company, was injured while accompanying a subordinate on a work-related errand.[28] Although Witmer claimed that his motives for taking the trip were personal, we noted that he would inevitably evaluate the performance of the subordinate

and stood to benefit from the subordinate's successful completion of the errand.[29] Also, because Witmer was the president of the company, his actions, unlike Milos's, could not be considered unauthorized.[30] Hence, even if Witmer could be understood as being "off-shift" during the trip, there was a stronger nexus between Witmer's actions and his employment than is present in this case.

Quality argues that the estate seeks to "draw an arbitrary line in time, making all post-shift accidents noncompensable." We agree that an arbitrary line would be undesirable. But we are also unwilling to accept the contrary view that any employee injury occurring on the employer's premises is automatically compensable, no matter how far removed from the employee's working hours. The Larson treatise strikes a sensible compromise between these absolutist positions, suggesting that an employee injured during a "reasonable period" before or after working hours may be covered if she is engaged in activities "necessary" or "reasonably incidental" to her work,[31] but that an employee who "merely loiters around the work place before or after hours" may not be covered.[32] Under Larson's approach, arriving at work early to change clothes and have a cup of coffee,[33] or leaving late because of commuting arrangements,[34] might be within the scope of workers' compensation, but remaining at the workplace to drink beer and become intoxicated would not be.[35]

---

**22.** *Id.* (quoting *Sokolowski v. Best W. Golden Lion Hotel*, 813 P.2d 286, 290 (Alaska 1991)).

**23.** *Witmer v. Kellen*, 884 P.2d 662, 665 (Alaska 1994).

**24.** *M–K Rivers*, 599 P.2d at 136; *Marsh*, 584 P.2d at 1136.

**25.** *Seville*, 977 P.2d at 109.

**26.** *Id.* at 108.

**27.** *Witmer v. Kellen*, 884 P.2d 662 (Alaska 1994) (quoting *M–K Rivers*, 599 P.2d at 136).

**28.** *Id.* at 664.

**29.** *Id.* at 666.

**30.** *Id.*

**31.** *See* 2 LARSON, *supra* note 21, § 21.06[1][a].

**32.** *Id.* § 21.06[1][c].

**33.** *See Stewart v. United States*, 716 F.2d 755, 759, 763 (10th Cir.1982) (holding that injury suffered by employee arriving twenty-three minutes early to change clothes and have cup of coffee was covered by workers' compensation).

**34.** *See Babkees v. Electrolux Corp.*, 4 A.D.2d 710, 163 N.Y.S.2d 809, 809 (N.Y.App.Div.1957) (holding that injury suffered by employee while being picked up by her husband one hour after working hours was covered by workers' compensation).

**35.** *See Lona v. Sosa*, 420 N.E.2d 890, 892, 895 (Ind.App.1981).

Applying the Larson standard to this case, Milos's activities are outside the exception for employees injured during a "reasonable interval" after their shift ends. Drawing all inferences in favor of the estate, Milos's shift ended at 10:00 and he suffered his fatal injury within thirty minutes thereafter. We assume that thirty minutes can be a "reasonable interval" in some circumstances. But regardless of whether the interval was reasonable, Milos's unauthorized use of the ATV cannot be considered "necessary" or "reasonably incidental" to his work. If a factfinder believes the estate's evidence, Milos was loitering at the work site for purely personal reasons after his shift had ended. Quality presented no evidence to suggest that his loitering benefitted Quality in any way, or was otherwise connected to his work. The estate has therefore demonstrated that there is a genuine issue of material fact as to whether Milos's actions were outside the scope of workers' compensation.

We also note that Milos's post-shift diversion is distinguishable from that of an employee acting during a lull in his duties. Some jurisdictions have held that the scope of workers' compensation is broader if the injury results from horseplay during such a lull.[36] Quality presses us to apply the same principle in this case.[37] An employee in a "lull" has little choice but to find a way to "pass the time" as he waits for his duties to resume; an off-shift employee is free to leave the work site and pursue recreational activities on his own. If he chooses to stay on the employer's premises for reasons unconnected to his work and then injures himself, such an injury is generally too remote from the course of his employment to be covered by workers' compensation.

## IV.  CONCLUSION

We hold that if all reasonable inferences are drawn in favor of the estate there is no sufficient nexus between Milos's unauthorized, post-shift actions and his employment with Quality to allow summary judgment based on the exclusive remedy provision of the workers' compensation statute. We therefore REVERSE the summary judgment and REMAND for further proceedings.

---

**36.** *See* 2 LARSON, *supra* note 21, § 23.07[5] (citing cases and noting that "workers whose jobs call for vigorous physical activity cannot be expected, during idle periods, to sit with folded hands in an attitude of contemplation").

**37.** Quality asserts that "it is undisputed that Milos was injured during ... a lull in work." But in fact, the estate's entire appeal is based on its contention that Milos was injured after his shift ended. As noted above, the estate has effectively conceded that it cannot prevail if Milos was on-shift at the time of the accident. Therefore, we interpret Quality's brief as arguing that the "lull" doctrine should also apply to employees engaging in horseplay and other diversions after their shift is complete.